_____

**SO ORDERED,**

**Judge Katharine M. Samson**
**United States Bankruptcy Judge**
**Date Signed: March 30, 2020**

The Order of the Court is set forth below. The docket reflects the date entered.
_____

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**

| | |
|---|---|
| IN RE: JERRY R. ADKINS | CASE NO. 19-50936-KMS |
| PATRICIA A. ADKINS | |
| DEBTORS | CHAPTER 13 |

**OPINION AND ORDER**
**SUSTAINING OBJECTION TO CONFIRMATION**

This matter came on for hearing on the Objection to Confirmation of Debtors' Amended Chapter 13 Plan ("Objection"), ECF No. 46, by creditor Edgefield Holdings LLC ("Edgefield"). This proceeding is within the bankruptcy court's core jurisdiction under 28 U.S.C. § 157(b)(2)(B),(K), and (L).

Edgefield is the assignee of a $300,000 judgment against Debtors and one other individual. According to Edgefield's amended proof of claim, a large part of the debt is secured by Debtors' home at 2533 Mercedes Drive, Biloxi, Mississippi ("Home"). The amended plan ("Plan"), however, provides for avoidance of the judgment lien based on impairment of Debtors' exemptions under 11 U.S.C. § 522(b). Edgefield objects to confirmation based on this treatment of its claim and on other grounds, all of which are premised on the Home's value being considerably higher

than the amount in Debtors' schedules. The dispositive question, then, is the value of the Home. Based on the appraisal reports, expert testimony, arguments of counsel, and applicable law, the Court values the Home at $304,976. The Objection is therefore sustained and the Plan ordered amended based on this value.

## FINDINGS OF FACT

The following facts, taken from the record, are not in dispute.

In July 2017, Debtors and another individual consented to a $300,000 judgment in favor of Hancock Bank under the terms of a promissory note and commercial guaranty. Cl. No. 9-1, Pt. 2 at 4-5. In November 2018, Hancock Bank assigned the judgment to Edgefield. *Id.* at 7-8. In May 2019, Debtors filed this chapter 13 case. ECF No. 1. As of the date of the petition, the amount of the debt with post-judgment interest was $326,961.60.[1] Cl. No. 9-1, Pt. 2 at 2.

The Home is subject to a prior interest, a February 2009 deed of trust ("Mortgage") evidenced by a proof of claim by the servicer of the underlying loan. *See* Cl. 1-1 at 22-35. The amount of the Mortgage claim is $158,509.74. *Id.* at 2. And Debtors claim $139,000 in exemptions in the Home. Sch. C, ECF No. 15 at 10.

Edgefield's claim is bifurcated, with $275,513.26 secured by the Home and $51,448.34 unsecured. Cl. No. 9-1 at 2. Edgefield calculated the secured portion by valuing the Home at $573,023 then subtracting the Mortgage claim and the exemptions. Cl. No. 9-1, Pt. 2 at 1 n.1 ($573,023.00 – $139,000.00 – $158,509.74 = $275,513.26).

---

[1] The proof of claim is internally inconsistent, with an apparent typographical error on the form portion. The claim form shows the amount as $362,961.60, and the attachment itemizing the judgment and the interest shows $326,961.60. *Compare* Cl. 9-1 at 2, *with* Cl. 9-1, Pt. 2 at 2.

2

**CONCLUSIONS OF LAW**

"An allowed claim of a creditor secured by a lien on property in which the estate has an interest . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property . . . and is an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim." 11 U.S.C. § 506(a). It follows that the extent to which Edgefield's judgment lien may be avoided depends on the value of the Home. Applying § 506(a), Edgefield's lien may be entirely avoided only if the Home is worth $297,509.74 (the sum of the Mortgage claim and the exemptions) or less.

### I. Debtors' Valuation

At hearing, Debtors offered the appraisal report and expert testimony of Daniel Schroeder of Biloxi, Mississippi. Schroeder is a certified general appraiser, licensed real estate broker, and licensed residential contractor. Tr., ECF No. 74 at 4. Over the past forty-three years, he has performed more than 10,000 residential appraisals. *Id.* at 4-5. Based on comparable sales and the Home's condition, Schroeder calculated $223,860 as the Home's market value. *Id.* at 21-22.; Schr. Rep., ECF No. 68 at 4, 5. Finding comps by location was problematic because the Home is big—6480 square feet, including four bedrooms, five full bathrooms, one half-bathroom, and two fireplaces. Schr. Rep. at 4; Tr. at 11 ("We could not find any in the immediate area that sold that were 6,000 square foot."). So Schroeder focused instead on comparable age, the Home being forty-eight years old. Tr. at 11. He searched other older subdivisions to find three comps that were, respectively, forty years old, fifty-four years old, and thirty-nine years old. Schr. Rep. at 4; Tr. at 16. For Comps 1 and 3, he had to look as far as Bay St. Louis (approximately 22 miles from the Home) and Pascagoula (approximately 27 miles from the Home). Schr. Rep. at 4; Tr. at 17. But

Comp 2 was only 0.18 miles from the Home. Schr. Rep. at 4. And at fifty-four years old, it was also closest in age. *Id.*

All these houses were significantly smaller than the Home, ranging from approximately 4200 to 5000 square feet. *Id.* Schoeder adjusted for the noncomparable square footage by first performing a computer-aided regression analysis for each comp to calculate the value of the land without the house. Tr. at 15-16. Then he subtracted the land value from the selling price. *Id.* at 15. From there, he derived a price per square foot by which to multiply the difference between the size of the Home and the size of the comp. *Id.* Finally, he used market-based dollar amounts to adjust the comps up or down for differences between each comp and the Home in the number and kind of amenities. *Id.* at 12. For example, each full bathroom or fireplace was worth $2000, an in-ground swimming pool was worth $8000, and an inground pool with a pool house was worth $10,000. *Id.* at 13-14.

Schroeder also considered the Home's "physical deterioration." Schr. Rep. at 5; Tr. at 9 ("[The] house has so many physical delayed maintenance and conditions that it would have been hard to compare that to another house."). He took photographs of the Home inside and out showing multiple conditions of serious disrepair, including a second floor balcony with a wooden railing so rotten it was "absolutely dangerous," fascia board so rotten that a long piece had fallen off the Home and still lay where it landed, and a bedroom wall where squirrels that had invaded the attic chewed holes "right through the wallpaper on two spots." Tr. at 10; Schr. Rep. at 21, 25 (photos). Taking as a baseline his estimate of the Home's value in average condition, Schroeder used his past experience as a contractor, his ongoing experience performing bank appraisals for homes under construction, frequent conversations with builders, and industry cost guides to calculate and subtract $124,000 as the "cost to cure." Tr. at 11, 18-19, 21. But Schroeder also said this figure

4

was simply the midpoint of a cost range, the high point of which was $137,000. *Id.* at 31. For this reason, he agreed with the $130,000 that Edgefield's expert estimated as the cost to cure. *Id.*

Finally, because "listings set the ceiling," Schroeder considered the asking price of a house for sale across the street from the Home. *Id.* at 22. That house is half the size of the Home and lists for approximately $300,000 or $81.36 per square foot. *Id.* at 22-23; Schr. Rep. at 6. Observing that smaller properties sell for more per square foot than larger properties, Schroeder said "[t]here is no way that the [Home] in average condition could be any higher than that" and corroborated that statement with his comps unadjusted at $74.68, $59.20, and $64.72 per square foot. Tr. at 23; Schr. Rep. at 4.

## II. Edgefield's Valuation

Edgefield offered the appraisal report and expert testimony of Everette Ladner of Gulfport, Mississippi. Like Schroeder, Ladner is a certified general appraiser and licensed real estate broker. Tr. at 35-36; Ladner Rep., ECF No. 67 at 28. He holds an SRA, the highest national appraisal designation for residential properties. Tr. at 36. Over the past thirty-two years, he has performed thousands of residential appraisals in the Gulfport area. *Id.* at 36-37. He inspected the Home inside and out, but took photographs of only the exterior, at Debtors' request. *Id.* at 40. Like Schroeder, he based his appraisal on comparable sales and the Home's condition. *Id.* at 40-41. But Ladner calculated a much higher market value of $420,000. *Id.* at 46.

Unlike Schroeder, who prioritized age over location for his comps, Ladner prioritized location. *Id.* at 41. The four properties he selected were all within three to five miles of the Home. *Id.* They were located, respectively, in Bayou Oaks, Bayou View, Bent Oaks, and Waterside. *Id.* at 42-43. Like the subdivision where the Home is located, these subdivisions have "water

5

influence," which Ladner said "tends to upgrade the type of houses in the subdivision." *Id.* at 42-43.

Ladner's comps were all much newer than the Home, having been built between 1996 and 2006, whereas the Home was built in 1972. Ladner Rep. at 5. Explaining why he did not select properties of comparable age, he said, "[Y]ou can't always go by the chronological age." Tr. at 44. Instead, Ladner used "effective age." *Id.* at 44-45. Effective age is a subjective concept; "if you drive by the house and you look at the condition and you look at the style, how old do you think [the house] is." *Id.* Ladner estimated twenty years as the effective age of the Home, if $130,000 in repairs were performed, and ten years as the effective age of all his comps. *Id.* at 45.

Like Schroeder's comps, Ladner's all were significantly smaller than the Home, with the largest measuring 4,634 square feet. Ladner Rep. at 5. As did Schroeder, Ladner adjusted the comps for size. Tr. at 44. He began like Schroeder began, by subtracting the land value from the selling price. *Id.* But from there, Ladner's procedure diverged. Ladner "extracted" the contribution of various improvements by subtracting $100,000 from all his comps across-the-board. *Id.* at 44, 52. He calculated this adjustment based on the ten-year difference between the effective age of the comps and the effective age of the Home and an annual depreciation of 2.5 percent. *Id.* at 52. This $100,000 adjustment got the Home "update[ed] to our comps." *Id.* at 62. Debtors' counsel asked Ladner how the same adjustment could apply to both the newest comp and the oldest comp:

> Q: It's normal for a 13-year-old home to have the same $100,000 adjustment as a 23-year-old home?
>
> A: If the effective ages are similar, and so—like I said, you're using the wrong terminology and that's the reason I say it's incorrect. You're saying chronological age. I'm talking effective age. You can't use the chronological.

*Id.* at 52.

6

Ladner did not adjust for individual amenities, because he does not believe buyers think that way. *Id.* at 53 ("To have a $500,000 house and I'm going to sit here and adjust $2,000 for [a] fireplace, I don't think buyers are doing that."). Instead, he considered the amenities as part of overall value. *Id.*

### III. The Court's Valuation

"The Bankruptcy Code does not prescribe any particular method of valuing collateral, but instead leaves valuation questions to judges on a case-by-case basis." *Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship)*, 116 F.3d 790, 799 (5th Cir. 1997). As this Court has previously recognized, "[t]he bankruptcy court is not bound by valuation opinions or reports submitted by appraisers" and may: (1) "form its own opinion as to the value of property in bankruptcy proceedings"; (2) "accept an appraisal in its entirety"; or (3) "give weight only to those portions of an appraisal that assist the Court in its determination." *In re Grind Coffee & Nosh, LLC,* No. 11-50011-KMS, 2011 WL 1301357, at *6 (Bankr. S.D. Miss. Apr. 4, 2011).

The Court rejects Ladner's comps based on "effective age" and a $100,000 across-the-board adjustment in favor of Schroeder's comps based on actual age, which the Court believes in this instance align more accurately with the Home's true market value. The Court also accepts Schroeder's estimate of $124,000 as the cost to cure.

Of all the comps, the most useful is Schroeder's Comp 2, which at 0.18 miles away in the same neighborhood and fifty-four years old is most like the Home in both location and age. The selling price of Comp 2 yields a price per square foot of $59.20. Schr. Rep. at 4. For comparison, Schroeder's valuation of the Home after necessary repairs yields $53.68 per square foot, a figure consistent with the market reality that larger houses sell for less per square foot than smaller houses. But the Court also recognizes the truth in Ladner's testimony that a decision based on one

7

sale is incorrect. *See* Tr. at 56 ("[If] you use just one . . . that's a sale price. When you use other sales, it establishes a trend of what values are."). So, notwithstanding the consonance between Schroeder's Comp 2 and the Home, the Court takes all Schroeder's comps and averages their costs per square foot, calculating $66.20 per square foot as the correct multiplier for the Home. Multiplying $66.20 by 6480 square feet and subtracting $124,000 for repairs equals $304,976 as the Home's value.

## ORDER

**IT IS THEREFORE ORDERED** that the Objection to Confirmation is **SUSTAINED** and

**FURTHER ORDERED** that Debtors shall file within fourteen days an amended Plan that provides for treatment of Edgefield's claim consistent with the Home's value of $304,976.

*##END OF ORDER##*